William T. BRIGHT, Ed King, Dee Barwick, Lowell Lawson, Frank Jorgensen, Plaintiffs,

v.

QSP, INC., Defendant.

Civ. A. No. 2:90–0039.

United States District Court, S.D. West Virginia, Charleston Division.

Aug. 28, 1992.

F.T. Graff, Jr., Bowles, Rice, McDavid, Graff & Love, Charleston, W.Va., for plaintiffs.

Larry A. Winter and Charles L. Woody, Spilman, Thomas, Battle & Klostermeyer, Charleston, W.Va., for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is the motion by QSP, Inc. for summary judgment. The Court GRANTS the motion as to Count One, which asserts a breach of contract claim and DENIES the motion on the remaining issues. The Court further bifurcates Count Seven from the trial of the remaining issues. Count Seven alleges a breach of a July, 1986 contract and the issue raised there is separate, distinct and not germane to other counts in the amended complaint. The Plaintiffs' remaining causes of action based upon promissory estoppel, misrepresentation, interference with prospective relations and unjust enrichment will proceed to trial.

Under *Rule* 56(c), Federal Rules of Civil Procedure, summary judgment is proper only:

> "[I]f the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

A principal purpose of summary judgment is to isolate and dispose of meritless litigation. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

*Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552. To discharge this burden, the non-moving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

The relevant facts necessary to resolve the Defendant's motion for summary judgment on Count One are not in dispute. The individual Plaintiffs were shareholders of Bright of America, Inc. (BOA). William T. Bright (Bright) started BOA and owned in excess of 80% of its stock during the events giving rise to this litigation. BOA enjoyed a long-standing business relationship with QSP, a wholly owned subsidiary of the Readers' Digest Association, Inc. QSP is engaged in the business of providing organizations fund raising programs such as selling magazine subscriptions, food or gifts. BOA supplied QSP with gift products for distribution to various groups engaged in fund raising activities.

During the Fall of 1988, Bright, through BOA, sought a joint venture partner. Bright did this so he could devote more time to his other interests. BOA, through Bright and Frank Jorgeson, BOA's president, met with Tom Belli, president of QSP on November 3, 1988, to discuss a proposal for a joint venture. Jorgeson and Herb Horn, QSP's vice president, met subsequently in January, 1989, on the same subject. On February 10, 1989, BOA submitted a written proposal for joint venture to QSP.

On February 22, Belli and Horn telephoned Jorgeson and Bright. At the time QSP was having difficulty with Allegro, a supplier of food-gift products based in Georgia. Allegro appeared to be on the verge of going out of business, leaving QSP with fund raising contracts to fulfill and no certain source for supplying the food-gift products. During the phone conversation BOA agreed to accept Allegro's inventory and to undertake fulfillment of Allegro's product line for QSP. The next day QSP and BOA met to discuss the joint venture and BOA's receipt and processing of Allegro's inventory. More meetings occurred over the next several days with

representatives of QSP, BOA and Allegro all participating.

On March 23 and 24 QSP discussed with its parent company, The Readers' Digest, the relationship established with BOA. QSP then informed BOA that The Readers' Digest sought an 80% interest in the joint venture. Subsequently, accountants and consultants of QSP visited BOA to review its finances and accounting procedures.

On May 25 and 27 Bright and Herb Horn met at The Greenbrier in West Virginia to negotiate the joint venture. Bright and Horn discussed a price of 7.5 million dollars for QSP's 80% of the joint venture. The projected closing of the deal was scheduled tentatively for July or August, 1989. It contemplated a stock transfer from BOA to QSP on June 30, 1991.

Subsequent to these negotiations, QSP and BOA failed to enter into any formal contract memorializing the terms and conditions of the joint venture. The two entities, however, did continue to conduct business which included distribution of the Allegro inventory and the distribution of gifts pursuant to a previously entered written contract.

On August 4, 1989, Bright sent a letter to QSP purportedly to "memorialize" the agreements between BOA and QSP regarding the purchase and joint venture. Ten days later, Belli sent Bright QSP's response to the purported "memorialization" of the agreement. Belli adamantly denied that an agreement had been reached but recognized that the parties were engaged in discussions regarding the sale of 80% of BOA to QSP. Belli further stressed that QSP could not enter into the letter agreement as submitted by Bright due to the magnitude and complexity of the proposed joint venture. Moreover, Belli opined that the legal departments of both BOA and QSP would have to agree upon "all terms and conditions, wording, timing and a dozen other things."

In Count One, Plaintiffs assert a cause of action based upon the Defendant's breach of the alleged oral contract to purchase an 80% interest in BOA for 7.5 million dollars. The remaining counts, with the exception of Count Seven, assert various legal theories to recover damages as a result of the informal business relationship commenced by BOA and QSP subsequent to the discussion of February 22, 1989. Count Seven asserts a cause of action unrelated to the others for a breach of a written contract between BOA and QSP dated July 1, 1986.

■ Defendants move for summary judgment on Count One based upon the West Virginia Statute of Frauds. It provides in relevant part:

> "A contract for the sale of securities is not enforceable ... unless: (a) there is some writing signed by the party against whom enforcement is sought ... sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price."

*W.Va.Code*, § 46–8–319. To be enforceable under West Virginia law, the sale of securities must be in writing and signed by the party against whom enforcement is sought unless the sale falls into a recognized exception. *Quinn v. Beverages of W.Va., Inc.*, 159 W.Va. 571, 224 S.E.2d 894 (1976). A contract for the sale of securities is not enforceable absent a writing unless

> "(b) Delivery of a certified security or transfer instruction has been accepted, or transfer of an uncertified security has been registered and the transferee has failed to send written objection to the issuer within ten (10) days after receipt ...;

> (c) Within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten (10) days after its receipt; or

> (d) The party against whom enforcement is sought admits in his pleading, testimony, or otherwise in court that a contract was made for sale of a stated

quantity of described securities at a defined or stated price."

*W. Va. Code,* § 46–8–319.

It is uncontested that the alleged contract between BOA and QSP entered on May 25 and 27, 1989, was wholly oral. The only attempt to reduce the parties' agreement to writing was the August 4 letter by Bright to QSP. Tom Belli, on behalf of QSP responded to Bright's purported letter/agreement on August 14 strongly denied the existence of an agreement but conceded discussions were ongoing. From this correspondence, it is obvious that there is no writing signed by the party against whom enforcement is sought. Moreover, none of the exceptions to a written agreement apply since no delivery of securities has been accepted by QSP, QSP objected timely to Bright's purported letter/agreement and QSP denied consistently the existence of a contract for the sale of securities.

BOA seeks to avoid application of the Statute of Frauds by asserting that the oral agreement was not for the sale of securities. This assertion is contrary to Plaintiffs' own complaint and the evidence developed in this case. In Count One, Plaintiffs assert that "[a] binding and enforceable agreement and contract for QSP to acquire 80% of BOA *stock* for the total price of $7,500,000 was agreed to by QSP and Bright, acting individually and on behalf of other BOA shareholders." Complaint, ¶ 22. Numerous other documents and deposition testimony also demonstrate that the parties contemplated a sale of securities. Under these circumstances, the West Virginia Statute of Frauds applies.

The Court concludes that the oral contract forming the basis of Count One in Plaintiff's complaint is unenforceable since there is no writing signed by the party against whom enforcement is sought. The alleged contract is precluded from enforcement pursuant to the West Virginia Statute of Frauds, *W. Va. Code,* § 46–8–319.

Irrespective of the West Virginia Statute of Frauds, the alleged oral contract is unenforceable. Under West Virginia law, "[a] meeting of the minds of the parties is a *sine qua non* of all contracts." *Martin v. Ewing,* 112 W.Va. 332, 164 S.E. 859, Syl. pt. 1 (1932). There is simply no evidence indicating a meeting of the minds between BOA and QSP. Absent from the Plaintiff's alleged agreement are such matters as the purchase price, the structure of the proposed transaction, the ownership percentages, the assumption or retirement of existing debt and a closing date. The negotiations of May 25 and 27, 1989 can best be described as preliminary negotiations whereupon the parties were to complete a deal on terms and conditions to be mutually agreed upon. These preliminary negotiations fail to establish the existence of a contract sufficient to provide a cause of action for its breach. See *Wheeling Downs Racing Ass'n v. West Virginia Sports Service, Inc.,* 157 W.Va. 93, 199 S.E.2d 308 (1973).

Accordingly, the Court GRANTS the Defendant's motion for summary judgment as to the breach of contract theory set forth in Count One. Since there exist genuine issues of material fact as to Counts Two through Six, the Court DENIES the Defendant's motion as to these counts. The Court ORDERS Count Seven bifurcated from the trial of this matter since the issue raised is unrelated to the issues presented in the other counts.